UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MONTGOMERY TOWNSHIP, MONTGOMERY TOWNSHIP POLICE DEPARTMENT, EAST NORRITON TOWNSHIP, and EAST NORRITON TOWNSHIP POLICE DEPARTMENT, <br><br>             Plaintiffs, <br><br> v. <br><br> FORD MOTOR COMPANY, <br><br>             Defendant. | **CIVIL ACTION NO. 02-CV-4710** |

**DEFENDANT'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION TO REMAND**

This case is one of at least fifteen lawsuits filed in various federal and state courts across the country alleging that the fuel tank placement in Ford's Crown Victoria Police Interceptor vehicles constitutes a safety-related defect that renders these vehicles unreasonably dangerous and renders Ford, accordingly, liable to plaintiffs. *See* Class Action Complaint at ¶¶ 7-12 ("Compl."). Many of these cases have been removed to federal court based on jurisdictional analyses similar to that employed here. Remand motions have been filed in some of these actions. Meanwhile, Ford has asked the Judicial Panel on Multidistrict Litigation ("MDL Panel") to transfer each of these cases to a single district court and consolidate them for pretrial proceedings pursuant to 28 U.S.C. § 1407. A hearing on that motion is scheduled for September 26th, and Ford expects its motion to be granted shortly thereafter. Once that motion is granted, a single U.S. District Court Judge will be appointed to handle all pretrial matters in this and the other constituent actions (including ruling on any pending motions, such as remand motions). Accordingly, although Ford understands the Court's decision to order briefing on plaintiffs'

remand motion, Ford asks this Court to defer ruling on that motion pending a ruling on Ford's MDL Motion.

Notwithstanding this request, Ford here responds to the arguments advanced in plaintiffs' remand motion. Diversity jurisdiction exists in this case, as in the other Crown Victoria class actions that have been filed, because the amount in controversy exceeds $75,000 and the parties to this putative class action are completely diverse. Federal question jurisdiction also exists because, while plaintiffs purport to seek relief only under Pennsylvania common-law theories, their claims necessarily turn on whether the Ford vehicles of which they complain have a "safety-related defect" as that term is defined under the federal National Traffic and Motor Vehicle Safety Act, 49 U.S.C §§ 30101-30170 ("Safety Act"). This is a characteristically federal question, resolution of which in plaintiffs' favor would necessitate a safety-related recall of these vehicles per the Safety Act and its implementing regulations. Indeed, plaintiffs explicitly seek such a recall in their complaint. *See* Compl. at Prayer for Relief. Because plaintiffs seek a recall of the vehicles at issue to cure the alleged safety-related defect, their ostensible state-law claims are completely preempted by the Safety Act, giving rise to federal question jurisdiction.

## Argument

### I.     FEDERAL DIVERSITY JURISDICTION EXISTS OVER THIS CASE.

The Court has diversity jurisdiction over this case because all parties are completely diverse and the amount that plaintiffs' complaint places in controversy exceeds $75,000.

## A.    Complete Diversity Of All Properly Joined Parties Exists.

Complete diversity exists because all parties are completely diverse. *See* 28 U.S.C. §
1441(b).  Plaintiffs, for diversity purposes, are citizens of the state of Pennsylvania. *See, e.g.,*
*Illinois v. City of Milwaukee*, 406 U.S. 91, 97 (1972); *Caporossi v. Atlantic City, New Jersey*,
220 F.Supp. 508, 509 (D. N.J. 1963).  The defendant, Ford, is a Delaware corporation with its
principal place of business in Dearborn, Michigan.  Therefore, complete diversity exists. *See,*
*e.g., Strawbridge v. Curtiss*, 7 U.S. 267 (1806).

## B.    This Case Satisfies The Amount-In-Controversy Requirement.

This case meets the other requirement for the exercise of diversity jurisdiction, as it
places more than $75,000 in controversy with respect to each named plaintiff. *See* 28 U.S.C. §
1332(a).  Plaintiffs here assert claims under Pennsylvania law for strict liability, breach of
warranty, and negligence.  Under these theories, plaintiffs' complaint seeks a number of
remedies.  Plaintiffs seek "[d]amages representing the cost of repair or modification of the gas
tanks of all Ford Crown Victoria police cruisers." Compl. at Prayer for Relief.  Plaintiffs also
seek a "[r]ecall of all Crown Victoria automobiles used by police departments and political
subdivisions in Montgomery County, with appropriate payment for the value of said vehicles, or
replacement of said vehicles." *Id.*[1]  In addition, plaintiffs ask that the Court "[r]equir[e]
Defendant to add protective shields and/or install new tanks with a bladder or protective inner
liner" and to make "[s]uch other modifications to the gas tanks as are necessary to protect the
safety of police officers and other persons using said vehicles." *Id.*  Finally, plaintiffs seek
"[a]ppropriate pre-judgment interest, attorneys' fees, costs of suit, delay damages and whatever
other remedy this Court deems appropriate." *Id.*

---

[1]    Ford suspects that plaintiffs meant to request a recall of all such vehicles in the **Commonwealth of**
**Pennsylvania,** inasmuch as that is the scope of the proposed class in this second-filed action.

Plaintiffs' claims, as articulated in their complaint, place more than $75,000 per named plaintiff in controversy.

### 1.    Plaintiffs' Request For The Replacement Value Of Each Vehicle.

As noted above, the plaintiffs seek "appropriate payment for the ***value*** of said [Crown Victoria] vehicles, or ***replacement*** of said vehicles." *Id.* (emphasis added).  Upon information and belief, the replacement value of only those Crown Victoria vehicles that each named plaintiff has purchased just within the last three years exceeds $75,000.  As Ford noted in its removal papers, since 1999, East Norriton Township and Montgomery Township have each purchased at least ***eight*** Crown Victoria Police Interceptors.  *See* Declaration of Rodney Benjamin (attached at Tab A).  Plaintiffs' remand motion does not deny that they presently own at least this many Crown Victoria Police Interceptors.  Indeed, given that the vehicles at issue include those built and sold as early as 1991, Ford suspects that the actual number of vehicles as to which plaintiffs seek relief is much higher.

Assuming for present purposes that each named plaintiff's claims pertain to only eight vehicles, the $75,000 jurisdictional amount requirement is easily met based on plaintiffs' explicit request for a damage award in the amount of the replacement value of each vehicle.  The dealer price for the 2001 model Crown Victoria Police Interceptor vehicle is $20,808.  *See* 2001 Police Interceptor Price List (attached at Tab B).  Hence, the "replacement" value of only those Crown Victoria Police Interceptor vehicles that Montgomery Township and East Norriton Township have purchased in the last three years alone exceeds $165,000.

Seeking to avoid this conclusion, plaintiffs contend that Ford's reading of their complaint contains a "fatal flaw."  *See* Plaintiffs' Memorandum of Law In Support Of Plaintiffs' Motion For Remand at 4 ("Pl. Mem.").  Because, plaintiffs contend, "there is no allegation in Plaintiffs'

Complaint that any of the Plaintiffs have replaced or have to replace any of the vehicles in question because of the defect," there is "no possible way that an 'appropriate payment' in this matter, that is, a payment that is appropriate under the law, would be an amount based on the cost of a new replacement vehicle[.]" *Id.* Plaintiffs argue that – despite the unambiguous language of their complaint, which asks for "appropriate payment for the value of said [Crown Victoria] vehicles, or replacement of said vehicles," *see* Compl. at Prayer for Relief – the "'appropriate payment' being sought by Plaintiffs is not reasonably measured by the value of a new replacement vehicle, but by the cost of repair of the defect." Pl. Mem. at 5. This, plaintiffs maintain, is the only "reasonable reading of the value of the rights being litigated" here. *Id.* at 4 (citing *Lennon v. Bridgestone/Firestone, Inc.*, No. Civ. A. 00-4469, 2000 WL 1570645 (E.D. Pa. Oct. 19, 2000)).

Plaintiffs' belated attempt to disown the relief explicitly requested in their complaint is squarely foreclosed by the Third Circuit's recent decision in *Werwinski v. Ford Motor Co.*, 286 F.3d 661 (3rd Cir. 2002) (attached at Tab C). There, the Third Circuit held, on facts closely resembling those here, that plaintiffs suing Ford under Pennsylvania warranty law theories satisfied the amount-in-controversy requirement where the prayer for relief in their complaint requested the purchase price of their vehicle, even though plaintiffs' remand brief purported to disown this request and instead seek only relatively minor repair costs. In *Werwinski*, a putative class sued Ford in Pennsylvania state court, alleging that Ford incorporated defective transmission parts in certain of its vehicles. The plaintiffs in *Werwinski* sued Ford under Pennsylvania law for breach of express warranty, breach of implied warranty, fraudulent concealment, and violations of Pennsylvania's Unfair Trade Practices and Consumer Protection Law. Ford removed the case on diversity grounds. After this Court denied the *Werwinski*

plaintiffs' motion for remand, holding that their claims placed more than $75,000 in controversy, *see Werwinski v. Ford Motor Co.,* No. Civ. A. 00-943, 2000 WL 375260 (E.D. Pa. Apr. 11, 2000), the plaintiffs appealed the denial of remand to the Third Circuit.

The Third Circuit began its amount-in-controversy analysis by noting that a court considering its diversity jurisdiction must adopt a "reasonable reading of the value of the rights being litigated." 286 F.3d at 666 (quoting *Angus v. Shiley Inc.,* 989 F.2d 142, 146 (3rd Cir.1993)). The court then considered the argument of the *Werwinski* plaintiffs that "the amount in controversy for each plaintiff does not even approach $75,000 because their complaint requests compensatory damages ***for only the costs of repairing or replacing the defective transmissions***, which range from $848 to $2,434." *Id.* (emphasis added). The court found that the *Werwinski* plaintiffs' "erroneous assertion that their complaint does not claim damages based on the purchase price of the automobiles is belied, however, by their complaint's 'Prayer for Relief,' which plainly seeks recovery for, *inter alia,* 'compensatory damages' and 'all or part of the sums [appellants] paid to purchase or lease [their] automobiles' . . . [and also] demands that [Ford] disgorge, for the benefit of the class, its ill-gotten profits received from the sale or lease of the subject vehicles and/or make full restitution to the Named Plaintiffs and the other members of the Class.'" *Id.* at 666-67. A "reasonable reading" of these allegations, the Third Circuit held, led to the conclusion that the *Werwinski* plaintiffs were seeking not only the costs of repairing their vehicles' transmissions, but also the cost of replacing their allegedly defective vehicles:

> If the 'Prayer for Relief' in their complaint did not request an order declaring Ford 'financially responsible ... for all or part of the sums [appellants] paid to purchase or lease [their] automobiles' or demand that Ford disgorge 'its ill-gotten profits received from the sale or lease of the subject vehicles,' then we might say that appellants' argument has some merit. Nevertheless, because of these provisions, ***the complaint clearly leaves the door open for them later to demand reimbursement for the purchase price of***

> ***the cars.***  And because the district court must base its amount-in-
> controversy determination on what a jury reasonably could award
> appellants, it cannot be said that the court erred in concluding on
> the basis of the complaint that a jury could decide that appellants
> are entitled to refunds for the purchase price of their cars.

*Id.* at 667 (emphasis added).

 *Werwinski* is dispositive precedent for this Court's exercise of its diversity jurisdiction over this case.  Here, plaintiffs do not ask for the replacement of their vehicles via a disgorgement theory, as the *Werwinski* plaintiffs did.  Instead, plaintiffs here explicitly ask for "***payment for the . . . replacement*** of said [Crown Victoria] vehicles."  Compl. at Prayer for Relief (emphasis added).  The only "reasonable reading" of that request is that plaintiffs seek what they say they seek:  the replacement cost of plaintiffs' Crown Victoria vehicles.  In any event, as in *Werwinski,* regardless how plaintiffs now choose to characterize their requested relief, "the complaint clearly leaves the door open for them to later demand [the full replacement cost of the vehicles they own]."  286 F.3d at 667.  As such, plaintiffs' request for vehicle replacement costs alone meets the jurisdictional amount requirement.

### 2. Plaintiffs' Repair Cost Request.

 In addition to requesting payment for the replacement value of the Crown Victoria Police Interceptor vehicles at issue, plaintiffs also seek "[d]amages representing the cost of repair or modification of the gas tanks of all Ford Crown Victoria police cruisers" that plaintiffs have purchased.  Compl. at Prayer for Relief.  At least one other municipality with Crown Victoria Police Interceptor vehicles in its law enforcement fleet, the city of Chandler, Arizona, has chosen to modify its vehicles by installing a protective bladder in its fuel tank in this manner.  The installation of bladders on 130 vehicles owned by the city of Chandler "will cost an estimated $225,000" – or over $1700 per vehicle.  *See* "Chandler Will Spend $225,000 To Install

Bladders," The Arizona Republic, June 28, 2002

(http://www.arizonarebulbic.com/special20/articles/0628chandvic28-ON.html). Similarly, the

"Fact Sheet" on Ford Crown Victoria Police Interceptor vehicles posted on a website related to

another Crown Victoria Police Interceptor putative class action lawsuit now pending in the U.S.

District Court for the Southern District of Texas states that bladders cost "about $1800 to

install." *See* "Ford Crown Victoria Police Interceptor Fuel-Fed Fires Fact Sheet,"

http://www.crownvictoriasafetyalert.com/CvfactSheet.html at 3.

Assuming that the repairs or modifications the plaintiffs seek here cost $1,700 per Crown

Victoria Police Interceptor vehicle, East Norriton Township and Montgomery Township are each

asking for at least $13,600 in compensatory damages for the costs of repairing the eight Crown

Victoria vehicles of which Ford is already aware. As noted above, if the actual number of

vehicles upon which plaintiffs' claims are based is higher, this would obviously increase the

amount in controversy still more.

### 3.    Plaintiffs' Punitive Damage Request.

In addition to the costs of replacing, repairing, and modifying their Crown Victoria

vehicles, plaintiffs have requested "whatever other remedy this Court deems appropriate."

Compl. at Prayer for Relief. Given the plaintiffs' high-decibel allegations to the effect that Ford

knowingly sold dangerous police cars over the period of a decade, it is surely reasonable to

conclude that a jury that accepts plaintiffs' allegations would find it "appropriate" to award

plaintiffs a substantial amount of punitive damages. Juries routinely award punitive damages in

significant amounts in product-liability cases where a "safety defect" is alleged. *See, e.g., Bemer*

*Aviation, Inc. v. Hughes Helicopter, Inc.*, 621 F.Supp. 290, 300-01 (E.D. Pa. 1985) (approving

punitive damage award of $1 million when compensatory damages were only $11,500 in product

liability action); *Friedman v. F.E. Myers Co.*, 710 F.Supp. 118, 122-25 (E.D. Pa. 1989) (surveying Pennsylvania law concerning proper ratio of punitive damages to actual damages and finding punitive damages award of $30,000 "appropriate" under Pennsylvania law where compensatory damages for negligence and strict liability in product defect action were $1,000).

Plaintiffs' belated attempt to disavow interest in a punitive award in their remand brief, *see* Pl. Mem. at 6, does not change the fact that punitive damages must be considered in this Court's jurisdictional analysis.  Although the complaint may not invoke the specific phrase "punitive damages" as among the various forms of "appropriate" remedies it seeks, neither does it expressly disavow punitive damages.  As such, punitive damages are very much on the table in this case.  In any event, courts determine the amount-in-controversy based on plaintiffs' allegations at the time of removal, not based on plaintiffs' characterization in remand briefing of the relief their complaint seeks.  *See Steel Valley Auth. v. Union Switch Div.,* 809 F.2d 1006, 1010 (3rd Cir.1987) (district court's determination as to the amount in controversy must be based on the plaintiff's complaint at the time the petition for removal was filed); *Werwinski*, 286 F.3d at 667 ("the amount in controversy must be calculated based on a 'reasonable reading' of the complaint, and a plaintiff's stipulation subsequent to removal as to the amount in controversy or the types of relief sought is of 'no legal significance' to the court's determination") (citations omitted).

Considering the compensatory damages the plaintiffs seek for the cost of repairing and/or modifying their Crown Victoria vehicles, relevant Pennsylvania remedies law, and the dramatic allegations that the plaintiffs level at Ford in this case – i.e., that Ford knows of a dangerous defect in its Crown Victoria Police Interceptor vehicles yet has done nothing to eliminate that defect while continuing to market those vehicles to potential purchasers as safe and fit for their

intended purpose, *see, e.g.,* Compl. at ¶ 10, 16 – it is reasonable to assume that if the plaintiffs could prove their case, "appropriate" relief would include a punitive damages award of at least $45,000 per named plaintiff.

### 4.    Plaintiffs' Attorneys' Fee Request.

Finally, plaintiffs seek attorneys' fees.  Compl. at Prayer for Relief.  The amount of that prospective fee award also must be included in the determination of the amount in controversy. *See Missouri State Life Ins. Co. v. Jones,* 290 U.S. 199, 202 (1933); *Suber v. Chrysler Corp.*, 104 F.3d 578, 585 (3rd Cir. 1997); 28 U.S.C. § 1332(a) (excluding only interest and costs from amount in controversy).  In a suit of this nature and magnitude, it is reasonable to assume that those fees will amount to at least $20,000 per named plaintiff.  *See, e.g., Suber v. Chrysler Corp.*, 104 F.3d 578, 585 (3rd. Cir. 1997).  Taken together, then, the plaintiffs' request for compensatory damages, punitive damages, and attorneys' fees exceed $75,000 per named plaintiff and give this Court diversity jurisdiction.

### 5.    Plaintiffs' Attempt In *Montgomery Township II* To Limit Their Damages To $75,000 Is Ineffectual.

Plaintiffs ask the Court to remand this case (Docket No. 4710 or *Montgomery Township I)* on the additional ground that the complaint in their later-filed case (Docket No. 5815 or *Montgomery Township II)*--contains the *pro forma* statement that "[n]one of the Plaintiffs' damages exceed the sum of $75,000."  Pl. Mem. at 4.  This is a make-weight argument.

As plaintiffs concede, their complaint in **this case** (which is the operative document for determining the amount in controversy presented by **this case**) contains no limitation regarding the amount sought.  As noted above, this Court's task in assessing the amount in controversy presented by the complaint is to adopt a "reasonable reading of the value of the rights being litigated." *Werwinski,* 286 F.3d at 666 (quoting *Angus v. Shiley Inc.,* 989 F.2d 142, 146 (3d

Cir.1993)).  The Court should itself decide the amount in controversy based on the totality of the complaint.  The fact that plaintiffs later filed a second lawsuit in which they added a self-serving statement that the value of the relief sought is at least one dollar less than the jurisdictional amount (even if persuasive in *Montgomery Township II,* which it is not) does not change the jurisdictional amount analysis in *Montgomery Township I.*  This is especially true where, as here, a clear-eyed review of the damages actually placed at issue make it clear that far more than $75,000 is at stake.

* * *

Because all parties to this action are completely diverse and this action places more than $75,000 per plaintiff in controversy, this Court has and therefore must exercise diversity jurisdiction over this case.

## II.      FEDERAL QUESTION JURISDICTION EXISTS OVER THIS CASE.

This Court also has jurisdiction because the National Traffic and Motor Vehicle Safety Act, 49 U.S.C. §§ 30101-30170 ("Safety Act") completely preempts plaintiffs' request for a court-ordered recall superintended by the Pennsylvania state court system, and because this action presents substantial federal questions.

A brief review of the evolution of the Safety Act, the exclusive role of NHTSA over motor vehicle recall issues, and NHTSA's pending investigation of Crown Victoria Police Interceptors will help elucidate the basis for the Court's federal question jurisdiction:

***The Original 1966 Safety Act.***  Before Congress enacted the Safety Act, neither federal nor state law provided a mechanism for recalling motor vehicles.  The 1966 Safety Act initiated a shift in the law, with Congress ultimately settling on an elaborate scheme governing motor vehicle defect notification and correction that vests exclusive oversight authority in NHTSA.

The Safety Act aimed "to reduce traffic accidents and deaths and injuries resulting from traffic accidents." 49 U.S.C. § 30101. Observing that "manufacturers ha[d] not always taken effective steps to insure the speedy and efficient repair of [safety-related] defects," Congress found an "essential" need to establish "*Federal oversight of defect notification, and correction*." S. Rep. No. 89-1301, at 2 (1966), *reprinted in* 1966 U.S.C.C.A.N. 2709, 2710 (emphasis added). The Safety Act reflects Congress's conclusion that "the primary responsibility for regulating the national automotive manufacturing industry must fall squarely upon the Federal Government." *Id.* at 4, *reprinted in* 1966 U.S.C.C.A.N. at 2712.

The initial means chosen to accomplish these objectives were twofold. **First**, Congress delegated authority to NHTSA to "prescribe motor safety vehicle standards" for all vehicles sold in the United States. 49 U.S.C. § 30111(a). **Second**, and more relevant here, the statute imposed upon manufacturers obligations to notify consumers of safety-related defects. *See id.* § 30118. Congress reinforced the importance of this requirement by providing for "Federal oversight," targeted to ensure manufacturers' compliance with the "essential" obligation of providing "uniform" consumer notice. S. Rep. No. 89-1301, at 2, 8, *reprinted in* 1966 U.S.C.C.A.N. at 2710, 2716. The Secretary of Transportation was to exercise this oversight "with extreme caution," making certain to evaluate carefully both "the risks to traffic safety" and the need "to avoid premature publicity of unevaluated reports as to suspected defects." *Id.*, at 8, 9, *reprinted in* 1966 U.S.C.C.A.N. at 2716, 2717.

**The 1974 Recall Amendments.** In 1974, the Congress changed the Safety Act through the Motor Vehicle and Schoolbus Safety Amendments ("Recall Amendments"). *See* Pub. L. No. 93-492, 88 Stat. 1470 (1974). Congress concluded that the original Safety Act's remedy of notice alone had proved to be an insufficient means of protecting consumers from products

posing risks of failure and injury. There existed a plain "necessity" for a new form of relief – an "adequate and timely remedy of a motor vehicle with a defect . . . ." *Id.*, *reprinted in* 1974 U.S.C.C.A.N. at 6050-51. Congress endeavored not only to create the new remedy, but to develop new and improved "administrative mechanisms" to ensure its effective implementation. *Id.*, *reprinted in* 1974 U.S.C.C.A.N. at 6050.

Congress added to the Safety Act a provision obligating manufacturers to remedy safety-related defects without charge to consumers. 49 U.S.C. § 30120(a). The Recall Amendments also empowered NHTSA to enforce this recall obligation. *Id.* § 30118(b). Congress determined that a recall remedy should issue only after NHTSA follows prescribed "administrative procedures." H.R. Rep. No. 93-1191, at 20 (1974), *reprinted in* 1974 U.S.C.C.A.N. [1st page], 6055. Any consumer can request a defect investigation, 49 U.S.C. § 30162(a), but recall orders cannot issue before NHTSA determines, "through testing, inspection, investigation, or research," that a vehicle contains a safety-related defect. *Id.* § 30118(a). Even then, NHTSA must both "giv[e] the manufacturer an opportunity" to rebut the agency's findings and permit "any interested person" to "present information, views, and arguments" as to whether a product presents risks warranting a recall remedy. *Id.* § 30118(b).

The Recall Amendments also expanded upon the original Act's consumer notification scheme. Congress added provisions touching on virtually every detail of a manufacturer's notice. As amended, the Safety Act requires that the notice include "a clear description of the defect"; "an evaluation of the risk to motor vehicle safety reasonably related to the defect"; "the measures to be taken to obtain a remedy of the defect"; "a statement that the manufacturer giving notice will remedy the defect . . . without charge"; "the earliest date on which the defect . . . will be remedied"; and "the procedure the recipient of a notice is to follow to inform the Secretary of

Transportation when a manufacturer, distributor, or dealer does not remedy the defect . . . without charge." 49 U.S.C. § 30119(a). The aim of all this is "to ensure that notifications of defects . . . adequately inform and effectively motivate owners of potentially defective . . . motor vehicles [or related equipment]. . . to have such vehicles or equipment inspected and, where necessary, remedied as quickly as possible." 49 C.F.R. § 577.2.

In crafting its 1974 amendments, Congress stopped short of adding judicial remedies to the statutory scheme. Instead of enacting a Senate provision permitting NHTSA to bypass administrative proceedings with a lawsuit seeking declaratory or injunctive relief for products posing "immediate and unreasonable risk[s]" to consumer safety, *see* S. 355, 93d Cong § 113(1) (1973), Congress opted for mandatory agency action in the first instance. Congress concluded that administrative (as opposed to judicial) recall mechanisms would commit NHTSA "to act swiftly when a motor vehicle or . . . equipment presents an unreasonable risk" through expedited agency proceedings.

Congress also declined to allow any judicial intervention into the administrative scheme. *See*, *e.g.*, S. 355, § 113(g) (2) (unenacted provision that would have entitled "any person" to challenge administrative proceedings in this Court); 120 Cong. Rec. 27,807, 27,808 (1974) (statement of Rep. Eckhardt) (urging adoption of a private right of action permitting citizens to challenge NHTSA determinations that ultimately was not adopted), *reprinted in* IV LEG. HISTORY at 174, 514. Congress again opted for exclusive administrative enforcement, informed through an open and inviting petition process made available to any interested consumer. *See* 49 U.S.C. § 30162(a). The Safety Act obligates NHTSA to rule promptly on consumer petitions for defect investigations; reasons for a denial must be published in the Federal Register, a mechanism reinforcing the importance of agency accountability. *Id.* § 30162(d).

In short, over a decade, the Safety Act evolved into a pervasive regulatory scheme reflecting measured congressional judgments about how best to protect consumers and manufacturers alike. Congress recognized that some risks to public safety mandate prospective action in the form of a product recall and a consumer notification campaign. Yet this mandate was not to issue without informed analysis, balanced negotiating, and careful tailoring. Congress instilled this obligation in an expert administrative agency, NHTSA, and expressly declined to give courts (either state or federal) the right to unilaterally order vehicle recalls.

The Safety Act confers broad remedial authority upon NHTSA to ensure manufacturer compliance with the statute's commands. *See id.* §§ 30118, 30120(e); 49 C.F.R. pt. 554. The statute empowers the agency to order a recall and notification campaign. *See* 49 U.S.C. §§ 30118(b)(2), 30162; 49 C.F.R. § 552.3. NHTSA may enforce its recall orders via a civil action in federal district court. *Id.* § 30163. Alternatively, NHTSA can choose not to enter an order if it finds that a product presents risks "inconsequential to motor vehicle safety." 49 U.S.C. §30118(d). Before settling on non-enforcement, however, NHTSA must permit "any interested person to present information, views, and arguments" to the contrary. *Id.*

By creating this administrative mechanism for resolving, on a uniform nationwide basis, concerns about alleged safety-related motor vehicle defects, Congress intended to preclude vehicle owners (and/or their lawyers) and courts (both federal and state) from circumventing and usurping NHTSA's authority via private state law-based lawsuits. The instant attempt by plaintiffs to have a single state-court trial judge order a recall of Crown Victoria Police Interceptors under the aegis of their state common-law claims is decidedly ***not*** the way Congress intended such matters to be addressed.

*NHTSA's Investigation Of The Crown Victoria Fuel Tank Issue.*  Plaintiffs' allegation that the placement and design of the fuel tank in the Crown Victoria Police Interceptors renders those vehicles unreasonably unsafe to passengers is precisely the kind of allegation that Congress intended be addressed exclusively through the NHTSA administrative process.  In the Safety Act, Congress delegated authority to NHTSA to "prescribe motor safety vehicle standards."  49 U.S.C. § 30111(a).  One of those standards (FMVSS 301) specifies requirements concerning the ability of motor vehicle fuel systems to withstand crashes without spilling fuel and starting fires.  The standard applicable to the Crown Victoria vehicles at issue here specifies that the vehicle be able to withstand a rear-end collision at 30 miles per hour under certain specified test conditions without leaking more than a specified amount of fuel.  49 C.F.R. § 571.301(S6.2).  It is undisputed that all 1991-2002 Crown Victoria vehicles meet (indeed they exceed) this federal safety standard.

In 2000, NHTSA tentatively decided that this standard should be increased.  Accordingly, it proposed (and began receiving comments on) a new fuel system safety standard that would require that all passenger vehicles built starting in 2006 be able to withstand a 50 mph rear-end collision without leaking more than a specified amount of fuel.  *See* Federal Motor Vehicle Safety Standards, 65 Fed. Reg. 67693-01 (proposed November 13, 2000) (to be codified at 49 C.F.R. pt. 571).  Although this proposed regulation has not to date been adopted, and would in any event not go into effect for three years following adoption, Ford's vehicles meet an equivalent standard today.  Indeed, when Ford subjected a 1996 Crown Victoria Police Interceptor to the proposed 50 mph test, it did not leak even a tenth-of-an-ounce of fuel.  (NHTSA's proposed test protocol allows for 30 ounces of fuel leakage over 30 minutes.)

From time to time, various so-called consumer safety advocates have urged NHTSA to make fuel system standards even more exacting—requiring vehicles to withstand rear-end collisions of up to 70 mph without leaking substantial quantities of fuel. But NHTSA has recognized that moving or redesigning fuel tanks to withstand such an impact is controversial—there are important countervailing considerations that must be taken into account. Balancing the safety benefits of such a rule against the adverse consequences of redesigning automobiles in ways that would guarantee that they withstand such impacts, NHTSA has repeatedly declined to require that vehicles be built to withstand rear-end collisions at greater than 50 mph.

Yet NHTSA's view that the public interest does not require that motor vehicles be built to withstand ultra-high speed rear end collisions has not ended the debate. On October 31, 2001, for example, David J. Perry, a plaintiffs' attorney in a Crown Victoria class-action lawsuit against Ford filed in Texas that closely resembles this one, wrote a letter to NHTSA asking that agency to investigate the safety of the Crown Victoria's fuel systems, and to order that those vehicles be recalled and retrofitted with a different fuel system design. *See* Letter from David J. Perry to Kathleen DeMeter (Oct. 31, 2001) (attachments omitted) (attached at Tab D) In other words, Mr. Perry asked NHTSA to declare that, even though these vehicles admittedly exceed all of the federal government's current and future safety standards, they nevertheless should be recalled as constituting an unreasonable threat to public safety because they do not meet higher crash standards that NHTSA has never embraced.

Notwithstanding the legal and logical speciousness of Mr. Perry's position, NHTSA opened an investigation into the Crown Victoria fuel tank issue shortly after receiving his request. Pursuant to that investigation, NHTSA has requested and received substantial amounts of information from Ford and others concerning the ability of Crown Victoria vehicles to

withstand rear-end collisions without experiencing fires caused by leaking fuel. *See* Letter from Thomas Z. Cooper, Office of Defects Investigation to James Vondale, Ford Motor Company (Dec. 14, 2001) (attached at Tab E); Letter from J. Vondale to Kathleen C. DeMeter (Feb. 8, 2002) (attached at Tab F); Letter from James P. Vondale to Kathleen C. DeMeter (April 29, 2002) (attached at Tab G). NHTSA's investigation also includes the question whether Ford appropriately distributed and disseminated its Technical Service Bulletin describing repairs to the fuel tank area of the vehicles in question. NHTSA's investigation is still underway. When that investigation concludes, NHTSA presumably will either find that the vehicles at issue have a safety-related defect (and order Ford to take appropriate remedial steps), or will not find any defect (and close its investigation without taking any further action).

With this NHTSA investigation proceeding, plaintiffs pursue this lawsuit, which asks a Pennsylvania state-court judge to take control of this vehicle safety issue away from the federal agency that is now investigating the issue; declare solely on the basis of attorney advocacy that these vehicles have a safety-related defect notwithstanding their compliance with FMVSS 301; and, based on Pennsylvania common law, order Ford to recall such vehicles.

### A. The Safety Act Completely Preempts This State-Court Suit, Which Implicitly Seeks A Nationwide Recall Of Ford Vehicles.

With the context of plaintiffs' request for a court-ordered motor vehicle recall now understood, it is clear that this Court has (and therefore must assert) jurisdiction over this case. Settled principles of federal jurisdiction establish that plaintiffs' nominally state-law-based suit – which seeks relief that only NHTSA has the power to order – cannot proceed in Pennsylvania state court in the face of the comprehensive regulatory scheme described above. "A fundamental principle of the Constitution is that Congress has the power to preempt state law." *Crosby v. Nat'l. Foreign Trade Council*, 530 U.S. 363, 372 (2000). The Constitution also empowers

Congress to preempt a request for a particular state-law based remedy.  *See Brown v. Kerr-McGee Chem. Corp.*, 767 F.2d 1234, 1237 (7th Cir. 1985).  A complaint that does not explicitly refer to federal law may be removed in the case of "complete preemption."  *Railway Labor Execs. Assoc. v. Pittsburgh and Lake Erie RR Co.*, 858 F.2d 936, 941-42 (3rd Cir. 1988).  "Complete preemption" occurs when "Congress . . . so completely pre-empt[s] a particular area that any civil complaint raising this select group of claims is necessarily federal in character."  *Metro. Life Ins. Co. v. Taylor,*  481 U.S. 58, 63-64 (1987).[2]

As the above description of the Safety Act's history, structure, and purposes shows, basic principles of complete preemption foreclose plaintiffs' request for a state-law based motor vehicle recall.  Indeed, another federal district court has already found that a class action plaintiff's request for a recall of allegedly defective motor vehicle parts is completely preempted by the Safety Act, and that claims for such relief are removable to federal court.  *Namovicz v. Cooper Tire & Rubber Co.*, No. CIV. A. WMN-00-3676, 2001 WL 327886, at *2 (D. Md. Feb. 26, 2001).  And two other federal district courts have dismissed claims seeking motor vehicle recalls on the basis of ordinary preemption by the Safety Act of those state law-based claims.  *See In re Bridgestone/Firestone, Inc., Tires Prods. Liab. Litig.*, 153 F. Supp. 2d 935, 943-48 (S.D. Ind. 2001); *Lilly v. Ford Motor Company,* No. 00 C 7372, 2002 WL 84603 (N.D. Ill. Jan. 22, 2002).

In each of these cases—*Namovicz, In re Bridgestone/Firestone,* and *Lilly*—the courts have held that, through the federal Safety Act, Congress vested in NHTSA exclusive authority to determine the need for, and if necessary supervise the implementation of, motor vehicle recalls.

---

[2]    Complete preemption, which creates federal question jurisdiction, is distinct from ordinary preemption (also known as "conflict preemption").  Ordinary preemption is a federal defense to a state law-based claim that may be asserted either in state or federal court, but it does not create a removable federal question.  *See, e.g., Johnson v. Baylor Univ.*, 214 F.3d 630, 632 (5th Cir. 2000).

In enacting the Safety Act and its comprehensive scheme for regulating automotive recalls and consumer notification campaigns, Congress expressed a strong preference for using administrative (not judicial) processes to protect the interests of consumers and manufacturers alike. As these courts have recognized, administrative agencies like NHTSA possess the expertise and perspective necessary to assess risks to public safety and to devise flexible, tailored responses to risks deemed too severe. A parallel, competing system of court-ordered and supervised recalls would undermine and frustrate the Safety Act's objectives of prospectively protecting the public interest through a scheme of administratively enforced remedies. *See Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492-95 (1987).

In *Railway Labor*, the Third Circuit distilled these complete preemption principles into a two-part test, both elements of which are met here. In the ***first*** part of the *Railway Labor* test, a court considering whether federal law completely preempts a plaintiff's state-law claims must consider "whether the statute relied upon by the Defendant as preemptive contains civil enforcement provisions within the scope of which the Plaintiff's state claim falls." *Id.*, 858 F.2d at 942. In other words, the federal statute must create a "federal cause of action vindicating the same interest the plaintiff's state cause of action seeks to vindicate." *Id.* If the federal statute vindicates that same interest, the first part of the complete preemption test is met, even if that federal statute does not "provide[] the same remedy available to the plaintiff under state law." *Id.*

As described at length above, the Safety Act contains comprehensive "civil enforcement provisions" through which owners of allegedly unsafe vehicle may vindicate their interest in obtaining binding determinations as to whether their vehicles have safety-related defects and, if so, obtaining mandatory recalls of those vehicles. The Safety Act grants NHTSA the authority to

investigate complaints by consumers and others relating to alleged safety-related defects, and to order manufacturers to recall any vehicle found to have such a defect. Plaintiffs explicitly seek a vehicle recall under Pennsylvania state-law tort theories. Their ostensible state-law claims, therefore, fall within the scope of the Safety Act's civil enforcement provisions.

Challenging this conclusion, plaintiffs cite *Burgo v. Volkswagen of America*, 183 F.Supp.2d 683 (D. N.J. 2001), for the proposition that the first part of the *Railway Labor* complete preemption test is not met here because the Safety Act confers no "***private*** right of the Plaintiffs to force a recall of the Police Interceptors in this case." Pl. Mem. at 9-10 (emphasis added). While that is a fair characterization of the *Burgo* decision, Ford submits, with respect, that *Burgo* misapplies the *Railway Labor* test and fails to give effect to the basic purpose of the complete preemption doctrine. *Railway Labor* does not hold that a federal statute must contain a "***private*** right of action" authorizing a consumer lawsuit; it merely says the federal statute must create a "***federal*** cause of action." The Safety Act does create a "federal cause of action." As noted previously, the Act authorizes NHTSA to file a lawsuit in federal court to enforce its administrative order directing a manufacturer to recall unsafe vehicles. That the Safety Act does not allow private consumers to do the same thing is hardly a reason to find that it does not completely preempt state law-based suits seeking the same remedy. Indeed, the opposite conclusion is more logical. Where (as here) the Act clearly confers exclusive authority in an administrative agency to litigate the issue of motor vehicle recalls in federal court, this is a strong sign that the federal legal regime governing such matters completely preempts efforts by private consumers and their lawyers to litigate this same issue in state court—a result that would undermine NHTSA's exclusive authority.

The **second** part of the *Railway Labor* test is also met.  Under this prong, the court must examine whether there is a "clear indication of a Congressional intention to permit removal despite the Plaintiff's exclusive reliance on the state law."  858 F.2d at 942.  As the court in *Namovicz* found, attempts by private litigants to circumvent NHTSA's exclusive authority over automotive recall determinations by bringing state law-based actions in state court are removable to federal court.  *Namovicz,* 2001 WL 327886, at *2 ("The effect of [Safety Act] sections 30118-30120 is to completely preempt the area of vehicle and equipment recalls. . . . and give[] this Court jurisdiction over the matter").  A judicially-administered competing scheme of recalls under state law "[would] stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in enacting the Safety Act.  *Crosby*, 530 U.S. at 373 (citations omitted); *see also Brown v. Kerr-McGee Chem. Corp.*, 767 F.2d 1234 (7th Cir. 1985) (holding that the Atomic Energy Act, administered by an expert agency, preempted plaintiffs' request for an injunction requiring the removal of radioactive waste to a particular location).

Plaintiffs again invoke *Burgo* to argue that the second prong of the *Railway Labor* test is not met.  As plaintiffs note, the *Burgo* court construed the Safety Act's "savings clauses," 49 U.S.C. § 30103, as suggesting congressional equivocation over whether removal of state law-based claims for vehicle recalls is proper.  Those savings clauses provide that "compliance with a motor vehicle safety standard prescribed under this chapter does not exempt a person from liability at common law," *id.* § 30103(e), and that recalls conducted pursuant to the Safety Act do not displace "any rights and remedies under other laws of the United States or a State."  *Id.* § 30103(d).  But the purpose of these provisions is both clear and unexceptional—they are designed to preserve state law-based lawsuits for ***money damages*** stemming from defect-caused vehicle malfunctions.  Hence, Section 30103(e) provides that the mere fact that a vehicle

complies with all federal safety standards does not immunize a vehicle manufacturer from

liability under state common law for a vehicle purchaser for damage caused by an allegedly

defective vehicle.  And Section 30103(d) provides that the mere fact that a manufacturer recalls a

vehicle does not immunize the manufacturer from liability for such claims.  To read these

provisions (as the *Burgo* court regrettably does) as suggesting congressional equivocation over

whether claims seeking ***government-ordered vehicle recalls*** could be sought pursuant to state

law is to stretch these savings clauses beyond their logical intent, and to ignore all of the

legislative history discussed above, which makes clear that Congress intended to vest ***exclusive***

***authority*** over recall determinations in NHTSA, with review of those determinations occurring

(as necessary) exclusively in federal court.[3]

Indeed, if one is to examine whether the Safety Act's savings clauses evince any

congressional intent about the propriety of removal of this case, one should not overlook Section

30103(b)(1), which provides that "[w]hen a motor vehicle safety standard is in effect . . . a State or

a political subdivision of a State may prescribe or continue in effect a standard applicable to the

same aspect of performance of a motor vehicle or motor vehicle equipment ***only if the standard is***

***identical to the standard prescribed under this chapter.***" (emphasis added).  That clause supports

a holding of complete preemption here.  Any finding that the Crown Victoria vehicles at issue

are "defective" because they are not immune from fuel tank leakage in rear-end collisions at

speeds greater than the 30 mph standard that NHTSA's FMVSS 301 standard establishes for

these vehicles would necessarily constitute an attempt by a state to impose vehicle safety

---

[3]     *Lennon v. Bridgestone/Firestone, Inc.,* 2000 WL 1570645 (E.D. Pa. 2000) (cited in Pl. Mem. at 9) is
arguably irrelevant to this debate.  *Lennon* rejects a complete preemption argument based on the conclusion that the
removing defendants failed to show that "compensating plaintiffs for misrepresentation or breach of warranty
conflicts with a NHTSA monitored, voluntary recall."  *Id.* at 3.  But there is no indication in *Lennon* that plaintiffs
explicitly sought a court-ordered recall.  They do here. Am. Compl. at Prayer for Relief (requesting "Recall of all
Crown Victoria automobiles . . . .").

standards that are inconsistent with those established by NHTSA.  Such an attempt is expressly preempted by Section 30103(b)(1).  *See Gracia v. Volvo Europa Truck, N.V.*, 112 F.3d 291, 297 (7th Cir. 1997) (the term "standard" in Safety Act's savings clause "not only refers to state statutes and regulations [that purport to compete with federal automotive safety standards], but can also refer to common law") (citations omitted).  Since the Pennsylvania state-law theory under which plaintiffs proceed in this case at a minimum "deviate[s] from" NHTSA's FMVSS 301 standard, the Safety Act's savings clause preempts their adjudication in Pennsylvania state court.

For the Safety Act to work and redound to consumers' benefit, NHTSA's authority over recalls must remain exclusive, as Congress intended.  *See Illinois v. Milwaukee*, 731 F.2d 403, 414 (7th Cir. 1984). ("[I]t would be extraordinary for Congress, after devising an elaborate permit system that sets clear standards, to tolerate common-law suits that have the potential to undermine the regulatory structure.").  Accordingly, this Court should find that plaintiffs' suit is completely preempted by the Safety Act, and hence creates federal question jurisdiction.

**B.    Plaintiffs' Claims Present A Substantial Issue Of Federal Law.**

Plaintiffs correctly state that "the general rule for determining the existence of federal question jurisdiction is whether or not a federal question is presented on the face of a plaintiff's well-pleaded complaint."  Pl. Mem. at 8.  That general rule, of course, is not the only rule. Federal question jurisdiction also exists where "it appears that some substantial disputed question of federal law is a necessary element of one of the well-pleaded state claims."  *See Franchise Tax Bd. v. Const r. Laborers Vacation Trust*, 463 U.S. 1, 9 (1983) ("We have often held that a case 'arose under' federal law where the vindication of a right under state law necessarily turned on some construction of federal law"); *Gully v. First Nat'l Bank*, 299 U.S. 109, 112 (1936).

Hence, "[a] plaintiff may not frame his action under state law and omit federal questions that are essential to recovery. . . .   In these cases, we will conclude that a plaintiff's claim actually arose under federal law and is therefore removable." *Burda v. M. Ecker Co.,* 954 F.2d 434, 438 (7th Cir. 1992).

The "substantial federal question" doctrine has its origins in the Supreme Court's decision in *Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180 (1921).  In *Smith*, a group of shareholders filed suit under state corporate law seeking an injunction prohibiting the corporation's board of directors from investing in bonds issued by the Federal Land Banks.  The shareholders believed that Congress unconstitutionally created the Federal Land Banks, and that any securities the banks issued might be invalid.  The Court held that the ostensible state law-based suit fell within the federal-question jurisdiction because plaintiffs' right to relief turned on a predicate determination about whether the creation of the Federal Land Banks complied with the federal constitution.  *See Smith*, 255 U.S. at 198-99.

Decisions of the Supreme Court and other courts around the nation make clear that the substantial federal question doctrine retains its original vitality today.  *Ormet Corp. v. Ohio Power Co.*, 98 F.3d 799, 807 (4th Cir. 1996), for example, shows how a complaint (like that here) that does not explicitly plead a cause of action under federal law can nevertheless raise a substantial federal question.  In *Ormet*, a manufacturer brought a claim against an electrical utility company for damages arising out of the utility's alleged violation of a tradable emissions permit contract issued pursuant to the federal Clean Air Act.  The manufacturer filed the action in federal court on the assumption that Section 408(j) of the Clean Air Act created a private right of action to enforce such contracts.  Disagreeing with this analysis, the district court construed the claim as a state-law contract action and dismissed the case for lack of subject matter

jurisdiction.  A unanimous panel of the Fourth Circuit reversed--not because the Clean Air Act created a private right of action for the manufacturer, but because this state law-based "private commercial dispute" nonetheless implicated substantial questions of federal law.  *See Ormet*, 98 F.3d at 804.

The Fourth Circuit reasoned that, while "in the 'vast majority' of cases where federal-question jurisdiction exists, federal law creates the plaintiff's cause of action," ***a class of cases exists "where, even though the cause of action is not created by federal law, the case's resolution depends on resolution of a federal question sufficiently substantial to arise under federal law within the meaning of 28 U.S.C. § 1331."*** *Id.* at 806 (emphasis added).  The court's determination as to whether a substantial federal question arises in a complaint that nominally asserts only state law claims "should be informed by a sensitive judgment about whether the existence of federal judicial power is both appropriate and pragmatic." *Id.* (citations omitted).  In particular, "[w]here the resolution of a federal issue in a state-law cause of action could, because of different approaches and inconsistency, undermine the stability and efficiency of a federal statutory regime, the need for uniformity becomes a substantial federal interest, justifying the exercise of jurisdiction by federal courts."  *Id.* at 807 (citing *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat) 304, 347-48 (1816)).

The Fourth Circuit's decision in *Ormet* is not atypical.  In *In re Wireless Telephone Radio Frequency Emissions Products Liability Litigation*, No. MDL 1421, CIV.A. 01-MD-1421, 2002 WL 1359321, at *7 (D. Md. June 21, 2002), a federal district court asserted federal question jurisdiction over a putative class action on behalf of cellular telephone users that alleged that the telephones were unsafe.  Although (like here) plaintiffs had invoked solely state law-based theories in their complaint, the court recognized that (like here) those claims *de facto* sought to

establish safety standards for cellular telephones that would compete with standards established by the Federal Communications Commission.  Under these circumstances, the court found that a substantial federal question existed because "[a]ny court faced with such a class and requested remedy necessarily must evaluate whether the FCC has been authorized by Congress to act as the final authority on the regulation of RF emissions from wireless phones, and whether the current RF requirements promulgated by the FCC adequately protect the public's health."  *Id.* at *7.

In *Drawhorn v. Qwest Communications International, Inc.*, 121 F. Supp. 2d 554 (E.D. Tex. 2000), plaintiffs filed a complaint in Texas state court asserting claims for trespass, slander of title, and a claim for declaratory judgment under Texas law – all based on the theory that the defendant communications company was trespassing on their land by laying fiber-optic cable along railroad tracks that crossed the plaintiffs' land.  The defendant removed the action to federal court, arguing that to prove essential elements of their Texas-law claims, the plaintiffs must persuade the court that a particular interpretation of various federal railroad statutes was appropriate.  Even though none of these federal statutes were invoked (or even mentioned) in the complaint, the district court upheld the removal and denied the motion to remand.  *See id.* at 561-64.

In *Frayler v. New York Stock Exchange, Inc.*, 118 F. Supp. 2d 448 (S.D.N.Y. 2000), plaintiff's complaint based four state-law claims -- injurious falsehood, fraudulent deceit, negligent misrepresentation, and breach of contract -- on various alleged regulatory requirements of the federal securities laws.  Although only state-law causes of action were asserted, the district court found federal question jurisdiction because:

> Here, the central premise of plaintiff's three tort claims – indeed, of the entire Complaint – is that the defendants themselves violated and purposely encouraged plaintiff and others to violate § 11(a) of the Exchange Act by promulgating erroneous and misleading

> interpretations of that statutory provision. . . . Thus, even assuming *arguendo* that defendants' alleged violation of § 11(a) would not itself give rise to a private right of action, *see Merrell Dow Pharmaceuticals, Inc. v. Thompson*, 478 U.S. 804 . . . (1986), "the federal issue [here] is decisive because upon [the federal statute's] construction [depends] the vindication of rights and definition of relationships" at the heart of the lawsuit. *West 14th St. Commercial Corp. v. 5 West 14th Owners Corp.*, 815 F.2d 188, 196 (2d Cir. 1987). In such circumstances, "the federal ingredient . . . is sufficiently substantial to confer the arising under jurisdiction."

*Id.*, 118 F. Supp. 2d at 450.

And finally, in *Ayres v. General Motors Corp.*, 234 F.3d 514, 518-20 (11th Cir. 2000), plaintiffs sued General Motors (among others) under Georgia's state RICO statute, arguing that the electronic control modules featured on certain GM vehicles were defective, and that GM concealed this defect in violation of Georgia's RICO statute. *See id.* On appeal, the Eleventh Circuit considered whether a substantial federal question arose from plaintiffs' allegations, which were couched wholly in terms of Georgia state law. The court, citing *Ormet*, held that the case presented substantial federal questions because "this case requires that we decide whether or not a breach of the disclosure duty under the Safety Act constitutes a federal . . . crime." *Id.* at 519. The court stated that "[t]he magnitude of the federal question at issue in this case is at least comparable to that of other federal questions which courts have found sufficient to confer federal question jurisdiction. *See Ormet*, 98 F.3d at 807[.]" *Id.*[4]

---

[4]    The court "f[ou]nd federal question jurisdiction in this case because the case involves both (1) the necessity for Plaintiffs to prove, as an essential element of their state law cause of action, the existence of federal mail and wire fraud crimes as predicate acts, which crimes would be enforceable in a federal civil RICO cause of action;  and (2) the fact that proof of the alleged federal mail and wire fraud crimes involves a very substantial federal question [*i.e.*, the extent of the duty to disclose facts pertaining to safety-related defects under the Safety Act]." *Ayres*, 234 F.3d at 520.  The court found that these two issues together presented a federal issue substantial enough to justify the court's exercise of jurisdiction.  *See id.* at 520 n.11 ("Because we rely on ***both*** of the facts mentioned in the text, we need not in this case decide whether either, by itself, is sufficient to confer federal question jurisdiction").

In this case, a careful analysis of the complaint reveals several substantial questions of law that can only be answered by reference to the federal Safety Act. *First*, the complaint presents the threshold question whether a state-court judge may, consistent with the Safety Act, order a manufacturer to recall a group of motor vehicles on the basis that they have a safety-related defect—especially when that very defect allegation is presently being investigated by NHTSA. As the above discussion of the Safety Act makes clear, the answer to that question is most assuredly "no."[5]   Indeed, NHTSA itself recently confirmed (in a public record) that "under the Safety Act, no other entity has jurisdiction to order notifications and remedies."  *See* NHTSA Settlement Agreement of June 1, 1999.  This Court should respect the agency's position.  *See Geier*, 529 U.S. at 883 (pointing to agency expertise and "plac[ing] some weight" upon the Department of Transportation's conclusion that tort liability could stand as an obstacle to accomplishing federal objectives); *see also Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (stating that agency interpretations "such as opinion letters" are "'entitled to respect'" under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).  Nevertheless, for present purposes the salient point is that any court that presides over plaintiffs' case must interpret and apply the federal Safety Act before it can grant plaintiffs any relief—an exercise that necessarily presents a substantial federal question.  *See, e.g., Wireless Telephone,* 2002 WL 1359321, at *14 (need to

---

[5]      *See also Syrie v. Knoll Int'l*, 748 F.2d 304, 311 (5th Cir. 1984) (finding no duty under Texas law for a manufacturer to recall a product); *Gregory v. Cincinnati Inc*., 538 N.W.2d 325, 334 (Mich. 1995) ("policymakers have explicitly delegated such authority [to order recalls] to administrative agencies" (citing the Safety Act)); *Ford Motor Co. v. Magill*, 698 So. 2d 1244, 1245 (Fla. Dist. Ct. App. 1997) ("NHTSA has accorded present owners of the vehicles a remedy to secure a correction of the problem to their vehicle, and Florida courts should defer to NHTSA"); *Patton v. Hutchinson Wil-Rich Mfg. Co*., 861 P.2d 1299, 1315 (Kan. 1993) ("We reason that product recalls are properly the business of administrative agencies as suggested by the federal statutes that expressly delegate recall authority" (citing Safety Act)); *Smith v. Firestone Tire & Rubber Co*., 755 F.2d 129, 135 (8th Cir. 1985) (no duty to recall independent of Safety Act); *Nat'l Women's Health Network, Inc. v. A.H. Robins Co*., 545 F. Supp. 1177, 1180 (D. Mass. 1982) ("No court has ever ordered a notification and recall campaign on the basis of state law"); *E. R. Squibb & Sons, Inc. v. Stickney*, 274 So. 2d 898, 907-08 (Fla. Dist. Ct. App. 1973) (manufacturer had no state law duty to recall product or advise that its use be discontinued despite instances of product failure).

examine whether federal law confers exclusive jurisdiction with federal agency is itself a substantial federal question for jurisdictional purposes).

   ***Second,*** even if the Court were to disagree with well-established authority and hold that it may, upon a sufficient record, order the motor vehicle recall that plaintiffs seek here, *see* Compl. at ¶ 81, the complaint calls upon the Court to decide whether the Crown Victoria Police Interceptors at issue contain a "safety-related defect" that necessitates a recall. Plaintiffs' allegations that the vehicles at issue have a "safety-related defect" such that they must be recalled necessarily implicate the federal Safety Act and associated federal agency regulations, inasmuch as those are the only laws that address this question in the context of recall requests. *See, e.g.,* 49 U.S.C. § 30118 (authorizing NHTSA to take certain actions when it finds that a vehicle "contains a defect related to motor vehicle safety"); 49 C.F.R. § 557 (specifying procedures by which NHTSA determines whether a vehicle should be recalled due to a "safety-related defect"); *United States v. General Motors Corp.,* 518 F.2d 420 (D.C. Cir. 1975) (discussing factors that NHTSA may apply to determine whether vehicle has a "safety-related defect" justifying recall).

   ***Third***, because this lawsuit directly attacks the validity of NHTSA's 30 mph fuel tank integrity safety standard (FMVSS 301), which was duly established under authority of the Safety Act,[6] this case raises a substantial federal question for the reasons explained in *In re Wireless Telephone Radio Frequency Emissions Products Liability Litigation. See id.* at 2002 WL 1359321, *7. There, the court asserted federal question jurisdiction over a group of ostensibly state-law-based class actions alleging that certain cellular phones had a safety-related defect because they did not come with headsets, and hence subjected their users to excessive radiation.

---

[6]       *See, e.g.,* Compl. at ¶ 51 (asserting that NHTSA crash-test standards, including FMVSS 301-75, are inadequate because "rear end crashes often occur at rates above government guidelines").

Although the plaintiffs framed their allegations solely in terms of state-law tort theories, the court held that their lawsuit really constituted an attack on the adequacy of the FCC's wireless phone safety standards. As the court said, "[a]lthough none of these claims explicitly challenge the FCC's radiation exposure guidelines, an examination of the class plaintiffs propose and the remedy plaintiffs request reveals that the true gravamen of these complaints is to attack the lack of a headset requirement under the federal RF safety rules." *Id.* at *7. The court found that this attack raised a substantial federal question because "[a]ny court faced with such a class and requested remedy necessarily must evaluate whether the FCC has been authorized by Congress to act as the final authority on the regulation of RF emissions from wireless phones, and whether the current RF requirements promulgated by the FCC adequately protect the public's health." *Id*. The FCC, the court noted, "has already considered and rejected a headset requirement. Thus, a state imposed headset rule necessarily invalidates the national standard. A suit to invalidate a federal regulation as unreasonable arises under federal law." *Id.*

This lawsuit presents the same situation. Although the Crown Victoria vehicles at issue meet (and exceed) the national safety standards NHTSA has established for fuel tank integrity, this lawsuit asks a court to, in effect, create a ***different, more rigorous*** safety standard applicable to the Crown Victoria Police Interceptor. In other words, this action implicitly attacks NHTSA's decision not to make the fuel tank standard higher than it is. Accordingly, the Court must evaluate whether NHTSA has been authorized by Congress to act as the final authority on the regulation of motor vehicle fuel tank integrity, and whether NHTSA's current standards adequately protect the public's safety. Because NHTSA has already considered and rejected the higher standard that plaintiffs here implicitly urge, any new standard the Court might impose in this case would necessarily invalidate the national standard. As in *Wireless Telephone*, a suit to

invalidate this federal regulation as unreasonable arises under federal law. *See* 49 U.S.C.

§ 30103(b)(1) (prohibiting states from imposing motor vehicle safety standards that are different

than federal standards).

To be sure, Ford does not here argue that *every* lawsuit alleging that a motor vehicle has

a safety-related defect *ipso facto* creates federal question jurisdiction. Every day, lawsuits

seeking monetary damages stemming from vehicle malfunctions caused by alleged defects are

properly filed in state courts, and resolved in accordance with definitions of "defective design"

created by the law of negligence, strict liability, and warranty. Ford does not contend that the

Safety Act's definition of "safety-related defect" lurks behind those actions, thus authorizing

their removal to federal court. *See, e.g., Howery v. Allstate Ins. Co.*, 243 F.3d 912, 918 (5th Cir.

2001) (no federal question exists where federal law is not the *sine qua non* for determining the

propriety of legal relief). But where (as here) a plaintiff attempts to obtain recovery including a

court-ordered recall concerning vehicles that have ***not*** malfunctioned based on the assertion that

they have a "safety related defect" – even though those vehicles ***concededly comply*** with

applicable NHTSA safety standards – such lawsuits ***necessarily*** implicate (and, indeed, attack)

the only body of law that exists to address such requests: the federal Safety Act itself, the

administrative regulations upon which NHTSA relies in making safety defect determinations,

and the various judicial decisions that address when NHTSA may (and may not) order a motor

vehicle recall. Accordingly, they present substantial federal questions, justifying resolution in

federal court.

In short, the *Ormet* and *Wireless Telephone* courts' "sensitive" analysis of "whether the

existence of federal judicial power is . . . appropriate and pragmatic" leads inevitably to the

conclusion that plaintiffs' case (and, indeed, each of the pending putative class actions that seek

court-ordered recalls of Crown Victoria Police Interceptors) belongs in federal court. *Ormet,* 98 F.3d at 806 (citations omitted). Here, plaintiffs ask a single state court judge to impose his own nationwide standard for vehicle fuel tank design that is far more ambitious than either the federal government standard that exists today, or the federal standard that is being considered for adoption in the future. Here, plaintiffs ask that single judge to create and manage his own recall program at the same time that NHTSA is considering whether the public interest justifies a nationwide recall. Here, plaintiffs ask that single judge to appoint himself to serve as a "one-man-NHTSA," even though such an act would flout the federal regime that Congress intended to constitute the final word on matters of automobile safety standards and safety-based recall orders. *See, e.g.,* 49 U.S.C. §§ 30111(a), 30118(a), 30162(a). So understood, it is clear that plaintiffs' attempt to litigate via a private class action the need for a mandatory safety-based vehicle recall is not only grossly improper but also, at minimum, raises a substantial federal question.

## Conclusion

Because both federal diversity and federal question jurisdiction exist in this case, the

Court should deny Plaintiffs' Motion for Remand and deny Plaintiffs' request for an award of

fees and costs.

Date:  September 3, 2002

Respectfully submitted:

_____

C. Scott Toomey

CAMPBELL CAMPBELL EDWARDS & CONROY, P.C.
Three Glenhardie Corporate Center
1265 Drummers Lane
Suite 200
Wayne, PA   19087
(610) 964-1900

John H. Beisner
Brian C. Anderson
Teresa E. Dawson
Kelly J. Riordan
Garrett W. Wotkyns
O'MELVENY & MYERS LLP
555 13th Street, NW
Suite 500 West
Washington, D.C.  20004
(202) 383-5300

*ATTORNEYS FOR DEFENDANT*
*FORD MOTOR COMPANY*